UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

MIGUEL VILLAREAL,

      Plaintiff,

v.                                                                                  06-CV-3266

WALKER et al.,

      Defendants.

### Order

This case proceeds on the following claims: 1) Eighth Amendment failure to protect; 2) Eighth Amendment deliberate indifference to serious medical needs; and 3) retaliation for the exercise of First Amendment rights. Before the court are two motions by the plaintiff to compel responses to his first request for production of documents and a motion to file a supplemental pleading filed by the plaintiff.

Only the second claim is now before the court: deliberate indifference to the plaintiff's serious medical needs. The medical defendants have moved for summary judgment, which is granted for the reasons below.

*Standard*

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether factual issues exist, the court must view all the evidence in the light most favorable to the non-moving party. *Beraha v. Baxter Health Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992). A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(e). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e).

1

*Undisputed Facts*

The court finds the following facts undisputed for purposes of this order only. The court has drawn factual inferences in the plaintiff's favor. However, many of the plaintiff's averments are inadmissible hearsay or allegations not based on personal knowledge and not supported by admissible evidence. Affidavits must be based on the personal knowledge of the affiant and "set out *facts* that would be admissible in evidence." Fed. R. Civ. P. 56(e) (emphasis added). Personal knowledge may include inferences and opinions drawn from those facts. *Visser v. Packer Eng. Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991). "But the inferences and opinions must be grounded in observation or other first-hand personal experience. They must not be based on flights of fancy, speculations, hunches, intuitions or rumors remote from that experience." *Visser*, 924 F.2d at 659.

1. On April 6, 2005, the plaintiff was incarcerated in Stateville Correctional Center. That night, about 6:30 p.m., other inmates crushed the plaintiff's left hand in a steel door. Around 10:30 p.m., the plaintiff was escorted to the health care unit. The nurse note states that the plaintiff arrived with his hand wrapped in a bloody towel, reporting that he had dropped a property box on his hand. The nurse's note reports puncture wounds and swelling to the plaintiff's left hand. Defendant Dr. Ghosh was notified and directed that the plaintiff be admitted to the infirmary for 23 hour observation, to be followed up with in the morning. Dr. Ghosh also ordered ice to be applied to the plaintiff hand and dressing changes. The plaintiff avers that his hand was swollen twice its size, that he was bleeding profusely and that he could see his bonds and tendons through the holes in his hands. The plaintiff avers that he "laid there, in the infirmary, in puddles of my own blood and in agonizing pain" throughout the night.

2. Dr. Ghosh saw the plaintiff the next morning (April 7, 2005) at around 11:00 a.m. and ordered an x-ray. The x-ray showed fractures of the second, third and fourth metacarpal. Dr. Ghosh directed that the plaintiff be sent in a state car to St. Joseph's Hospital in Joliet, Illinois. The plaintiff was admitted to the hospital that day, and Dr. Fanto performed surgery on the plaintiff's hand. On or about April 9, 2005, Dr. Fanto discharged the plaintiff, with "strict instruction to keep his left hand elevated, keep the dressing clean and dry and do not remove the dressing." Dr. Fanto also ordered a follow-up visit in one week to change the dressing and inspect the wound.

3. The plaintiff was transported from the hospital and admitted to the Stateville infirmary on or about April 9, 2005. Dr. Aguinaldo admitted the plaintiff to the infirmary. In the infirmary, the plaintiff received pain medication and antibiotics.

4. Dr. Ghosh saw the plaintiff on April 11, 2005. In Dr. Ghosh's judgment, the plaintiff was routinely progressing. Dr. Ghosh directed that the plaintiff keep his hand elevated and that he be allowed to take baths carefully so that his bandage did not get wet. Dr. Ghosh saw the plaintiff the next day, too, and ordered daily baths, hand elevation, Tylenol and Augmentin when available. Dr. Ghosh saw the plaintiff on April 14, 2005, and ordered that the Augmentin be continued and that the plaintiff go to the orthopedic for a follow up visit the next day.

5. On April 17, 2005, the plaintiff was referred for x-rays and a follow up visit with the orthopedic clinic. The report from the follow up visit indicates that no infection was present. A new splint was applied and some sutures were removed. The consultant directed that the plaintiff keep his hand elevated, keep his dressing clean and dry, and return to the office in one week.

6. The plaintiff saw Dr. Fanto on April 25, 2005. Dr. Fanto's report noted a complete dressing change and improved swelling. The report also reflected that the "K-wire" and sutures were removed, and a short-arm splint applied. He recommended an x-ray of the plaintiff's hand, to be reviewed at the "next office visit." It is not clear, however, when Dr. Fanto wished to see the plaintiff again. Dr. Ghosh approved the recommendation for the x-ray, which was done on April 28, 2005. Dr. Ghosh reviewed that x-ray on May 10, 2005, which made no recommendations or adverse findings.

7. On May 26, 2005, the plaintiff was transferred from Stateville Correctional Center to Western Correctional Center. It does not appear that the plaintiff saw Dr. Fanto again after the April 25, 2005 visit.

8. Dr. Brown saw the plaintiff on May 26, 2005, the day the plaintiff arrived at Western. Dr. Brown's note states that several stitches remained, a pin was protruding and that the fingers had little mobility. Dr. Brown ordered an x-ray that day and also advised the plaintiff to exercise his fingers, change his dressing every 3 days and keep his pin covered. The x-ray report ordered by Dr. Brown noted the existing fractures and "recommend[ed] comparison with prior films to evaluate for change of alignment." Dr. Brown reviewed the report and noted that the pin was properly positions and that metacarpals 3 and 4 were healing. He removed 3 stitches.

9. Dr. Brown next saw the plaintiff on June 16, 2005. Dr. Brown noted that the pin in the second metacarpal was impeding mobility and the plaintiff could not clench his fist. Dr. Brown recommended that the plaintiff be seen by an orthopedic physician.

10. On or about June 27, 2007, the plaintiff's remaining pin in his hand fell out. Dr. Brown saw him that day and noted that the extension of the plaintiff's index finger was "nil."According to Dr. Brown's note and his affidavit, Dr. Brown described to the plaintiff physical therapy exercises that he should perform.

11. On June 29, 2005, the plaintiff saw Dr. Crickard, an orthopedic surgeon. Dr. Crickard's report states in part:

> X-RAYS: X-rays of the left hand reveals a sheer fracture of the head of the 2nd metacarpal. There is less than 4 mm displacement. It is hard to tell whether the fracture line is still present or whether it is from the pinsite with toggling. He also has a distal 3rd metacarpal fracture with good alignment. He has a 4th what appears to be healed metacarpal neck fracture.

*           *           *

>    PLAN: At this time, I discussed with Miguel his diagnosis. We discussed treatment options. I would like to get him in therapy. He can followup with Mr. Steven DeMent in approximately 6 weeks. He should be able to gain near full motion, but he understands that he will always have a defect on that side. We should be able to get him back to gripping, however. He understood and was pleased.

Dr. Crickard wrote in his report that the next visit was to be "per Mr. Steven Dement and Dr. Brown."

12. Dr. Brown saw the plaintiff after the plaintiff's appointment with Dr. Crickard. Dr. Brown advised the plaintiff to stretch his MP joint and come back in six weeks. According to the plaintiff, Dr. Brown told the plaintiff that physical therapy was an "overrated profession" and that his bosses would "frown upon" outside physical therapy. According to the plaintiff, Dr. Brown prescribed rubberbands to be used for physical therapy, but the Warden would not allow them on the grounds that rubberbands are a security risk.

13. Dr. Brown next saw the plaintiff on July 27, 2005. Dr. Brown notes state that the plaintiff reported working his left index finger "enthusiastically." Dr. Brown noted that there was no appreciable improvement, but that it appeared better if soaked in warm water. Dr. Brown ordered warm tub soaks three times per week for one month.

14. Dr. Brown next saw the plaintiff on August 3, 2005. His note reported a 45 degree flexion in the left index finger and a 90 degree in the right. He noted a "50 percent motor and sensory deficit, slowly improving in his hand. Neuropathy and osteoarthritis." The plaintiff asserts that his finger was nowhere near 45 degree flexion. Dr. Brown ordered an x-ray. Dr. Brown read the x-ray report that day and noted that "the distal 2nd metacarpal healed in dorsal angulation, making flexion limited." In Dr. Brown's opinion, the fractured bone had healed in a way that limited flexion, and exercise and physical therapy would not have changed that result.

15. Dr. Brown next saw the plaintiff on August 8, 2005 and recommended that the plaintiff see an orthopedist. Dr. Brown's request for consultation was denied, however, on the ground that the plaintiff's x-rays showed healing. Dr. Brown was directed to repeat the x-ray in six weeks.

16. Dr. Brown completed another referral request on August 17, 2005. This time, the request was approved.

17. The plaintiff saw Dr. Crickard on September 15, 2005. Dr. Crickard ordered x-rays, home physical therapy and a follow up in six months. Dr. Crickard's report states in part:

>    X-RAYS: Left hand x-rays reveal a 2nd metacarpal phalangeal joint fracture of the metacarpal head. Midshaft 3rd, 4th fractures. Increased healing.

4

      *    *    *

> PLAN: At this time I discussed with Miguel his diagnosis. He needs to do exercises on hi own. He does not have the ability for formal OT and PT. I think he can get good relief just working on it on his own. I showed him the exercises to do. He voiced understanding. He will call my office for problems in the future.
>
> NEXT VISIT: Six months. X-ray hand.

18. The plaintiff saw Dr. Crickard again on December 6, 2005. Dr. Crickard's note states:

> . . .Miguel returns to clinic today. He is not a happy individual. He states that he was treated poorly and the system did not allow him to have physical therapy which caused him to have pain and decreased motion. He asked if therapy would help and I stated that more than likely it would have helped initially, but it is hard to say how much. He stated that this was the typical plantar answer he expected for me and the [sic] we are all working on this together to basically sink him. He stated that he was going to sue everybody. When he started to get a little agitated, the officer led him away. The x-rays actually show healed fractures.

19. Dr. Brown's note after the December 2005 visit to Dr. Crickard states that the ortho offered no new ideas. We may seek additional consultation in the new year. . . . See me in January 06.

20. Dr. Brown requested and received approval to send the plaintiff to a second orthopedic surgeon, Dr. Morton. On the request, Dr. Brown noted a "high probability of litigation." Dr. Morton saw the plaintiff on January 31, 2006. Dr. Morton's report notes "mild malunion & spur and arthrofibrosis . . . ." Dr. Morton stated that the plaintiff "might benefit from physical therapy to release arthrofibrosis . . . might benefit from capsular release followed by physical therapy but might get worse with surgery as well." In his report, Dr. Morton noted that the plaintiff had only about 10 degrees of flexion in his left index finger and a "significant spur to the metacarpophalangeal joint of the left index finger." Dr. Morton recommended getting the plaintiff some physical therapy to see if surgery could be avoided.

21. Dr. Brown referred the plaintiff to physical therapy on February 2, 2006. The plaintiff went to outside physical therapy on March 1 and March 17, 2006. The notes from the occupational therapist noted an increase in the plaintiff's range of motion.

22. The plaintiff was transferred to Pontiac Correctional Center, and out of Dr. Brown's care, in November 2006.

23. The plaintiff testified in his deposition that he is not able to make a fist with his left hand, though he was able to "somewhat bend" his fingers into a fist. He can touch the tip of every finger to his thumb, but he cannot "flex [his] hand closed." He testified that he might be able to

hold a pen, but not a book or heavy item. The problem is with his left index finger, which he cannot bend well. (Plaintiff's Dep. Pp. 31-39).

*Analysis*

Deliberate indifference to a serious injury or medical need violates a prisoner's rights under the Eighth Amendment to be free from cruel and unusual punishment. *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001); *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001), *citing Estelle v. Gamble*, 429 U.S. 153, 182-83 (1976). The injury or need must be objectively serious, *and* the official must personally know of the risk and consciously disregard it. *See Henderson v. Sheahan*, 196 F.3d 839, 845 (7th Cir. 1999); *Mathis v. Fairman*, 120 F.3d 88. 91 (7th Cir. 1997); *Wynn v. Southward*, 251 F.3d at 593 (2001). An objectively serious injury or medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Chapman*, 241 F.3d at 845, *quoting Zentmyer v. Kendall County* 220 F.3d 805, 810 (7th Cir. 2000)(*quoting Gutierrez v. Peters* 111 F.3d 1364, 1373 (7th Cir. 1997)). An objectively serious condition also presents itself if "'failure to treat [it] could result in further significant injury or unnecessary and wanton infliction of pain.'" *Reed v. McBride*, 178 F.3d 849, 852 (7th Cir. 1999), *quoting Gutierrez*, 111 F.3d at 1373. The subjective component (deliberate indifference) does not encompass negligence or even gross negligence. *Id.*, *citing Salazar v. City of Chicago*, 940 F.2d 233, 238 (7th Cir. 1991); *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). The prisoner must "show that the prison official was subjectively aware of the prisoner's serious medical needs and disregarded an excessive risk that a lack of treatment posed to the prisoner's health or safety." *Wynn*, 251 F.3d at 593, *citing Farmer v. Brennan*, 511 U.S. at 837; *Zentmyer*, 220 F.3d at 811. Deliberate indifference may also be inferred "when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate the person responsible did not base the decision on such a judgment." *Estate of Cole v. Pardue*, 94 F.3d 254, 261-62 (7th Cir. 1996); *see also Collingnon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998)(deliberate indifference may be established if "response so inadequate that it demonstrated an absence of professional judgment, that is, that nominally competent professional would not have so responded under the circumstances."). However, malpractice or disagreement with a doctor's treatment decisions cannot be the basis for an Eighth Amendment challenge. *Steele v. Choi*, 82 F.3d 175, 178-79 (7th Cir. 1996); *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996).

I. Dr. Ghosh

The plaintiff asserts that Dr. Ghosh should have immediately referred the plaintiff to the hospital, rather than waiting until the next day. However, he does not dispute Dr. Ghosh's averment that, pursuant to the report the nurse gave him, Dr. Ghosh did not believe that there was an immediate need to refer the plaintiff to the hospital. The nurse's notes reflect only puncture wounds and swelling, no profuse bleeding or visible bones and tendons. Further, at that

time the medical professionals were operating under the assumption that a property box had fallen on the plaintiff's hand, not that it had been slammed in a door. The plaintiff point to no evidence that Dr. Ghosh knew that the plaintiff's injury was so severe that it could not wait until the next day, nor is there evidence that waiting until the next day harmed the plaintiff in any way. Once Dr. Ghosh examined the plaintiff the day after the injury, Dr. Ghosh directed the plaintiff to be taken to the hospital that day, where surgery was performed. It is hard to imagine a quicker time frame even if the plaintiff was out of prison–at most maybe a few hours. The court sees no delay in Dr. Ghosh's actions, much less deliberate indifference.

The plaintiff also avers that Dr. Ghosh "made no provision" for elevating the plaintiff's hand and did not instruct the staff that the plaintiff had been approved for baths. The plaintiff avers that instead he got his dressing soaked in the shower and was placed in segregation in filthy conditions. He avers that he send numerous letters to Dr. Ghosh about the conditions. Dr. Ghosh, however, consistently ordered that the plaintiff elevate his hand and have baths. Dr. Ghosh cannot follow everyone around ensuring that his orders are implemented. Further, the court does not understand why the plaintiff needed Dr. Ghosh to help elevate his hand. The plaintiff also assails Dr. Ghosh's release of him from the infirmary, but there is no evidence to support the conclusion that this amounted to deliberate indifference to the plaintiff's serious medical needs. The plaintiff also asserts that he did not receive post-surgical follow up visits to Dr. Fantos. That is not entirely true: the plaintiff did receive two follow up visits. A third follow up was apparently contemplated, but it is not clear when Dr. Fantos though that should occur. It did not occur between April 25 (the plaintiff's second follow up visit with Dr. Fantos) and May 26 (the day the plaintiff was transferred to Western, and thus out of Dr. Ghosh's care). There is no evidence, though, of any deliberate indifference in not scheduling a follow-up visit during this month or of any harm.

In sum, on this record, no reasonable inference arises that Dr. Ghosh was deliberately indifferent to the plaintiff's serious medical needs. To the contrary, Dr. Ghosh ensured that the plaintiff timely received the care he needed and followed all post-surgical instructions. Summary judgment is therefore mandated for Dr. Ghosh.

*II.  Dr. Brown*

The plaintiff asserts that Dr. Brown was deliberately indifferent to his serious medical need for physical therapy for his hand, as recommended by Dr. Crickard in June 2005. However, the plaintiff does not dispute that Dr. Brown instructed him on exercises that he could perform on his own without a visit to a physical therapist. Dr. Crickard saw the plaintiff in September 2005 and concurred that the plaintiff could perform physical therapy on his own, and showed the plaintiff exercises to do on his own. Even Dr. Morton recommended another try at physical therapy. The plaintiff contends that an immediate referral to an outside physical therapist June 2005 would have improved his range of motion, but there is no basis in the record for that conclusion. On this record, "home" physical therapy was within the range of accepted professional judgment. The court understands it did not work, but that does not support an inference of deliberate indifference. Dr. Brown himself came to the conclusion that physical

therapy was not working and got the plaintiff referred to orthopedic surgeons, who nevertheless still felt that physical therapy should be tried for longer.

The plaintiff asserts that Dr. Brown should not have told him to exercise his fingers in May 2005, as the plaintiff still had a pin in his hand. The plaintiff asserts that his hand was still healing and the exercising it caused him pain and caused the pin to dislodge. Yet there is no basis in the record that the plaintiff's exercising his hand in May 2005 affected his recovery in any way, or that Dr. Brown's direction amounted to such a substantial departure from accepted practice that deliberate indifference can be inferred. The plaintiff also contends that Dr. Brown should have insisted that the plaintiff be allowed rubberbands to perform the physical therapy, but there is no basis in the record to support that contention either.

In sum, the plaintiff's evidence does not allow an inference that Dr. Brown acted with deliberate indifference. Accordingly, summary judgment is mandated for Dr. Brown as well.

IT IS THEREFORE ORDERED:

1) The motion for summary judgment by Defendants Ghosh and Brown is granted (d/e 61). At the close of this case, the clerk of the court is directed to enter judgment in favor of Defendants Ghosh and Brown and against the plaintiff. The plaintiff's claims against the non-medical defendants remain.

Entered this 24th Day of March, 2009.

**s\Harold A. Baker**

HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE