UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

MIGUEL VILLAREAL,
       Plaintiff,

v.                                               06-CV-3266

WALKER et al.,
       Defendants.

### Order

      The plaintiff is currently incarcerated in Hill Correctional Center. He pursues a claim against Defendants Walker and Battaglia for failing to protect him from an assault by other inmates at Stateville Correctional Center. He also pursues a claim against Defendants Polk and Zimmerman for retaliating against him at Western Illinois Correctional Center for protected First Amendment activities.[1] The defendants have moved for summary judgment, which is granted for the reasons below.

### *Summary Judgment Standard*

      Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This burden can be satisfied by "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(e). "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e). In determining whether factual issues exist, the court must view all the evidence in the light most favorable to the non-moving party. *Beraha v. Baxter*

---

[1] The deliberate indifference claims against the medical professionals (Defendants Goach and Brown) were dismissed on summary judgment in an earlier order. (3/24/09 Order).

*Health Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992).

## Facts

Many of these facts are adopted verbatim from the defendants' proposed undisputed facts, to the extent not disputed by the plaintiff. The cites are to the exhibits attached to the defendants' memorandum, d/e 94, unless otherwise noted.

1. The plaintiff was incarcerated in Stateville Correctional Center from June 2002 to May 2005.

2. In early 2005, the plaintiff "was approached by gang members and was made aware of an [alteration in the gang's recognition methods,] new ways of throwing up gang signs and shaking hands, to which [he] refused because [he] was not interested in participating in a gang." (Plaintiff's Affidavit, d/e 103, Ex. D). This was taken by the gang members as a sign of disrespect and rumors began circulating that the plaintiff might receive "formal charges" from the gang. *Id.* The year before the plaintiff had tried to participate in the gang renunciation program, but had decided against it because it required him to testify against gang members, which would have endangered his life. Even though Villareal did not participate in the renunciation program, the plaintiff believes that he became a suspect and was perceived as a threat by gang members. *Id.* ¶ 4-5.

3. The plaintiff avers that:

> 6) I contacted the Internal Affairs department and the administration several times about my fears of retribution from the gang, but I was told that without full cooperation and testimony against all the gang members or the ability to identify a specific individual whom I feared would assault me, there could be no protection afforded to me.
>
> 7) While in kick out segregation in February 2005, I believed I had the identifiable threat that they were looking for and I contacted Internal Affairs, Counselor Franklin, and Warden Dee Battaglia over the course of the next months seeking protection from the gang.
>
> 8) In March 2005, I saw Warden Battaglia in the visiting room while visiting with my mother and I questioned her about my letter and if she had received it. She said she received it and said they were investigating but she wasn't sure what more could be done. If I couldn't give her a name then her hands were tied at the time.

4. The plaintiff maintains in his answers to interrogatories that, from August 2004 to April 2005, he sent "repeated kites to Defendant Battaglia and Internal Affairs, warning of imminent danger upon Plaintiff's release from segregation in February of 2005. (Defendant's Interrogatories, p. 2).

5. Plaintiff alleges that upon his release from segregation in February of 2005 he was placed in the same cell house as James Garcia, "one of the gang heads" and a person Plaintiff had allegedly asked to be protected from. (Defendant's Interrogatories, p. 2; (Plaintiff's Deposition, pp. 94-95).

6. The plaintiff was moved to gallery nine on March 30, 2005. (Plaintiff's Aff. ¶ 9). Plaintiff did not refuse housing when assigned to a cell in D House in February or March of 2005. (Exhibit E). He did not ask for protective custody.

7. The night of March 30, 2005, at the showers, the plaintiff was surrounded by inmate James Garcia and other gang members of the Latin Folk Nation. He was informed of the "charges" against him, adjudged guilty, and Garcia punched the plaintiff in the mouth several times. (Plaintiff's Aff. ¶ 10). The plaintiff then assumed that the slate was clean, his problems over. *Id.* ¶ 11.

8. Plaintiff did not add James Garcia to his "Keep Separate From" list. (Exhibit E).

9. The gang members thought the plaintiff's punishment too lenient. On April 6, 2005, James Garcia told Plaintiff that he had the choice of receiving a three minute beating or getting his hand crushed in a door, as further punishment.

10. Plaintiff did not inform any prison staff about James Garcia's statement. (Plaintiff's Deposition, p. 95). "A couple hours" after Garcia's statement, on the early evening of April 6, 2005, Plaintiff was in the shower when he was accosted by several inmates who were gang members. The gang asked, "What's up? The hands or else." (Complaint ¶ 3); (Plaintiff's Dep. 94-95)("or else" meant stabbing, according to the plaintiff's deposition). The plaintiff's left hand was then slammed in a heavy metal door, "crushing . . . [and] shattering" the bones in his hand. *Id.* Plaintiff did not yell for help in the shower before he was attacked by fellow inmates. (Plaintiff's Deposition, p. 96).

11. After the attack and an investigation of the incident, a disciplinary report was written against Garcia, which states in relevant part:

> Inmate GARCIA is an active validated member of the security threat group - Insane Dragons, which is a faction of the Latin Folks.
>
> On 4/10/05 a 13-minute phone call was monitored that was made by inmate Garcia on 03/30/05 to . . . [Garcia's mother]. During the call a three way call is made by Garcia's mother to "Weso" . . . [a discharged inmate who is a "Nation Leader" of the Insane Dragons] . . . . The contents of the call are as follows, "GARCIA: I got a letter from Lee, has he spoken to you? It came to his attention about the thing with the Southside. He let me know that, to treat him just like us. Now I'm doing that no doubt, like I had told you with that one, that incident. And then on top of that I hear he was yelling out C-Blank and ya know. WESO: From

3

> the Insane Family, what the fuck is he on? . . . WESO: you got this from me, listen, you do what you gotta do, you ain't gotta explain nothing to me. . . ."
>
> \*     \*     \*
>
> . . . The phone call that was made on 03/30/05 Garcia is looking to [the Nation Leader] for guidance and approval to handle the business regarding inmate Villareal. . . .
>
> \*     \*     \*
>
> During the investigation, information was obtained from confidential informants and during interviews which identified inmate GARCIA as slamming inmate VILLAREAL . . . left hand in the shower door in Unit D. It was determined that GARCIA did this violent act as a violation against VILLAREAL for his disrespect displayed towards the Spanish Cobras, who are also considered "Folks" and allies to the Insane Dragons.

(d/e 103, Ex. E). These parts of the disciplinary report recounted the results of a 4/8/05 internal investigation report, which is filed under seal at d/e 68. Garcia was found guilty of assault, gang activity and abuse of privileges. *Id.,* Ex. F. The Adjustment Committee Report from that disciplinary hearing indicates that a statement was taken from the plaintiff in which the plaintiff denied Garcia's involvement. The plaintiff purportedly instead said he got injured "trying to prop his correspondence box on the top bunk." *Id.*

12. Defendant Battaglia was a warden at Stateville Correctional Center at all times relevant to the events described in Plaintiff's Complaint. (Plaintiff's Complaint, p. 2).

13. Defendant Battaglia did not personally review her mail. Her executive staff reviewed her mail on her behalf. (Affidavit of Dee Battaglia, ¶ 12, hereafter Exhibit D).

14. Defendant Battaglia did not personally review any mail or "kites" from Plaintiff or Plaintiff's family. (Exhibit D, ¶ 13).

15. Plaintiff alleges that Defendant Battaglia "should have been notified by her Internal Affairs staff" that Plaintiff was in danger. (Defendant's Interrogatories, p. 2).

16. On May 25, 2005, the plaintiff was transferred to Western Correctional Center. Defendants Polk and Zimmerman were wardens at Western during relevant times.

17. Plaintiff alleges his typewriter was damaged during a cell search on July 11, 2005. (Plaintiff's Deposition, p. 105 and Defendants' Interrogatories, p. 6). Plaintiff filed a grievance in regards to his damaged typewriter that was received by a grievance officer on July 15, 2005 and by the Chief Administrative Office on August 11, 2005. (Plaintiff's Grievance #05-0530,

hereafter Exhibit F). Plaintiff's first grievance at Western Illinois Correctional Center was in regards to this damaged typewriter. (Plaintiff's Deposition, p. 109).

18. Plaintiff alleges that Defendant Polk raised his security level on July 12, 2005 from medium to high escape risk in retaliation for filing grievances. (Defendants' Interrogatories p.6, Plaintiff's Deposition, p. 107).

19. Plaintiff alleges that Defendant Polk retaliated against him "by denying [his] grievances, by being indifferent, [and] by playing phone tag with [his] family when they called to try to speak with him." (Plaintiff's Deposition, p. 117).

20. Plaintiff does not have any evidence that Defendant Polk knew about grievances and incidents that happened at Stateville Correctional Center. (Plaintiff's Deposition, p. 116).

21. Plaintiff alleges that Defendant Zimmerman retaliated against him by denying him access to rubber bands to exercise his injured hand. (Defendants' Interrogatories, p. 14).

22. Using rubber bands as treatment for Plaintiff's hand injury was Plaintiff's idea. (Plaintiff's Deposition, p. 118). No medical professionals prescribed rubber bands nor otherwise indicated rubber bands would be helpful. Defendant Zimmerman is not a licensed physician, is not involved in the medical treatment of inmates, and relies on his staff of medical professionals. (Exhibit G, ¶ 3 and ¶ 5).

23. Plaintiff had access to rubber bands in the prison and would not be given a ticket for having them. (Plaintiff's Deposition, p. 118).

24. Defendant Polk is not a licensed physician and had no personal involvement in the diagnosis, treatment or medical care that Plaintiff received at Stateville Correctional Center. (Exhibit H, ¶ 3 and ¶ 6).

25. Plaintiff's sole allegation against Defendant Walker is that he "denied every single one of [Plaintiff's] grievances" that he appealed to the ARB. (Deposition of Miguel Villareal, November 13, 2007, pp. 122-123, hereafter "Plaintiff's Deposition" with relevant pages attached as Exhibit C). Plaintiff admits that he does not allege that Defendant Walker was personally involved in any way other than the fact that he denied his grievances. (Plaintiff's Deposition, p. 122).

26. The only letters bearing Defendant Walker's signature, in regards to this case and the injury Plaintiff sustained to his hand on April 6, 2005, are letters from the Administrative Review Board ("ARB) denying grievances #050530, #05-0635E, #050531, #05-0820E and #060134. (Affidavit of Terri Anderson, hereafter Exhibit B). Walker, however, did not personally sign these grievances. Terri Anderson signed Walker's name as an authorized designee.

27. This Court granted Defendants Ghosh and Brown's Motion for Summary Judgment. In this

5

order, the Court found that there could be no reasonable inference that either Defendant Ghosh or Defendant Brown was deliberately indifferent to Plaintiff's serious medical needs. (Exhibit I). Defendant Dr. Brown was Plaintiff's treating physician at Western Illinois Correctional Center. (Plaintiff's Deposition, pp. 42-43).

*Analysis*

*Failure to Protect*

Initially, it is clear that Defendant Walker bears no responsibility on this claim, mandating summary judgment for him. Only persons who cause or participate in the violations are responsible. *See George v. Smith,* 507 F.3d 605, 609 (7th Cir. 2007)("Ruling against a prisoner on an administrative complaint does not cause or contribute to the violation. A guard who stands and watches while another guard beats a prisoner violates the Constitution; a guard who rejects an administrative complaint about a completed act of misconduct does not."). The claim, therefore, is addressed only against Defendant Battaglia.

A constitutional claim based on an assault in prison, whether for a pretrial detainee or inmate, requires: 1) incarceration "under conditions posing a 'substantial risk of serious harm,'"; and 2) the defendant subjectively knew of and disregarded the risk (was personally aware, not just should have been aware). *Grieveson v. Anderson*, 538 F.3d 763, 775 (7th Cir. 2008)(quoted cites omitted). Actual notice of a specific threat or risk is necessary to prove a defendant knew of the risk and cannot be imputed through a generalized knowledge of danger or vague complaints. *Case v. Ahitow*, 301 F.3d 605 (7th Cir. 2002)(defendants are liable if they "really knew–not just should have known" of serious danger which could have easily been prevented); *Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir. 2002)(plaintiff's statement to officers that he was "having problems" and needed to be moved did not put sheriff on actual notice of specific risk of sexual assault); *Lewis v. Richards*, 107 F.3d 549, 553 (7th Cir. 1997)(summary judgment granted to defendants where plaintiff did not specifically seek protection from inmates who assaulted him, even though he had been assaulted before by different inmates).

A rational juror could not find for the plaintiff on these facts. The plaintiff told Warden Battaglia and Internal Affairs about his fear of retribution from gang members, but he did not give specifics. He does not say what he wrote in his "kites," what the letter said that he purportedly wrote to Battaglia, nor are any of these letters in the record. He does not dispute that he never put Garcia on his "keep away from" list, did not ask for protective custody or transfer, and did not refuse housing with Garcia. He also did not tell officials of the first assault by Garcia on March 30, 2005, when Garcia punched him in the face. Most importantly, he did not tell officials that he was going to be assaulted on April 6, 2005, even though Garcia gave him several hours advance notice. The court understands that the plaintiff felt he was in a catch-22 position: notifying officials of the specific risk would have (he believed) placed him in even greater danger of retribution. However, Battaglia cannot be held responsible for failing to protect the plaintiff from a serious risk that she did not know about. She did not know that an imminent assault on the plaintiff was likely because the plaintiff chose to keep it to himself.

6

Additionally, though the disciplinary report against Garcia recounted his 3/30/05 phone call, there is no evidence to contradict that officials put together the call's significance after the assault as a result of the investigation. And, there is no evidence that Battaglia was aware of the 3/30/05 phone call or its significance until after the assault. At most, Battaglia was on notice of generalized risk to the plaintiff from unspecified gang members. That is insufficient to prove failure to protect.

The plaintiff submits an affidavit from a former Stateville officer (from 1994-1998, and from December 2001 to April 2002), who avers that he witnessed assaults on inmates by both staff and other inmates. He avers that he witnessed "gangs being given access to shower areas by unit management to conduct business without fear of disciplinary action." (d/e 103, Ex. C, ¶ 7). He recounts two such incidents in 1997, and opines that "there was a protective custody unit but it was common knowledge that if you were a target of a gang, there was no true refuge within the institution. If a gang wanted one of their own 'got' they were 'got' no matter what." *Id.* ¶12. This officer came forward about the abuses, and was retaliated against and threatened because of it. *Id.* ¶¶ 14-18.

These allegations are disturbing, but they do not allow a reasonable inference that Battaglia knew of a substantial risk of serious assault to the plaintiff. First, the officer was at Stateville during a different time period. The shower assaults he recounts occurred in 1997. Second, the plaintiff kept crucial information from the defendants, out of fear of gang retribution. The plaintiff maintains in his answer to his interrogatories that he told officials about Garcia, but that statement is too vague, and is not supported by any other evidence. The plaintiff does not say who he told, how he told it, when, or exactly what he told. It is undisputed that the plaintiff did not request protective custody, did not refuse to cell with Garcia, did not tell the defendants about Garcia's first assault, and did not tell the defendants about Garcia's impending second assault. Under these facts, Battaglia cannot be found deliberately indifferent to a known, serious risk to the plaintiff's safety.[2]

The plaintiff also submits an affidavit of an inmate who was incarcerated in Stateville from 1986 to 1997. (d/e 103, Ex. A). He avers that numerous assaults took place in the shower area, and inmates knew the showers were dangerous. He avers that prison officials rarely followed the regulations regarding showers, and that inmates were on their own to defend themselves. Another inmate, incarcerated in Stateville from 1993-2002, avers that inmates knew where the "blind spots" were, one of them being in the shower area. (d/e 103, Ex. B ¶ 3-4). He describes shower time as a unmonitored "free-for-all." *Id.* ¶ 6. The court does not doubt the truth of these observations. However, the inmate affiants were at Stateville during different years than the plaintiff. Even if they had been at Stateville at the same time as the plaintiff, their affidavits alone would not establish the kind of serious, pervasive risk that would put the

---

[2]The plaintiff asserts that the defendants knew about Garcia's threat to the plaintiff, but used the plaintiff as bait so that they could catch Garcia committing a serious infraction. On this record, that is speculation unsupported by any evidence.

7

defendants on notice that the plaintiff faced a serious risk of assault in the showers. Further, the sealed investigative report indicates that an officer was supervising the showers at such frequent intervals that it was decided that there was not enough time for the three-minute beating, which is why the plaintiff instead had his hand slammed in the door.

In sum, the evidence on this record does show that the plaintiff was at a serious risk of substantial harm from Garcia. However, the record does not allow a reasonable inference that Battaglia knew about that risk. Therefore, Battaglia could not have been deliberately indifferent to that risk.

*Retaliation*

The plaintiff appears to claim that his security level at Western was increased in retaliation for protected First Amendment activities. He does not identify the protected activity, though, except for a grievance filed *after* the security level was increased. He also seems to assert that Zimmerman refused to give him rubber bands out of retaliation, but again he does not specify his protected conduct, and, in any event, the purported retaliatory act is *de minimis*. Further, there is no evidence that Zimmerman or Polk were motivated by any retaliatory motive (or Walker to the extent the plaintiff pursues a retaliation claim against him). The plaintiff seems to have abandoned this claim against them. The plaintiff now says that a Sergeant Bunn was the one retaliating against him. Bunn, however, is not a defendant, and it is too late to add him now.

IT IS THEREFORE ORDERED:

1) The IDOC defendants' motion for summary judgment is granted (d/e 93). The clerk of the court is directed to enter judgment in favor of the defendants and against the plaintiff. All pending motions are denied as moot, and this case is terminated, with the parties to bear their own costs.

2) If the plaintiff wishes to appeal this dismissal, he must file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(c). If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal.

Entered this 11th Day of February, 2010.

**s\Harold A. Baker**

HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE